JAY EDELSON*
jedelson@edelson.com
RAFEY S. BALABANIAN*
rbalabanian@edelson.com
BENJAMIN H. RICHMAN*
brichman@edelson.com
CHRISTOPHER L. DORE*
cdore@edelson.com
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone:  (312) 589-6370
Facsimile:  (312) 589-6378

SEAN P. REIS (SBN 184044)
sreis@edelson.com
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123

*Pro Hac Vice admission to be sought

Attorneys for Plaintiff-Intervenor Henry Espejo
and the Putative Class

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFF HIBLER, individually and on behalf of all others similarly situated,<br><br>                             *Plaintiff,*<br><br> *and*<br><br>HENRY ESPEJO, individually and on behalf of all others similarly situated,<br><br>                     *Plaintiff-Intervenor,*<br><br>*v.*<br><br>SANTANDER CONSUMER USA, INC., an Illinois corporation,<br><br>                             *Defendant.* | No. 5:13-cv-01354-JGB-OP<br><br>**PLAINTIFF-INTERVENOR HENRY ESPEJO'S REPLY IN SUPPORT OF PETITION TO INTERVENE**<br><br>Date:      October 21, 2013<br>Time:      9:00 a.m.<br>Judge:     Honorable Jesus G. Bernal |

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................... 1

II.  ESPEJO'S MOTION TO INTERVENE COMPLIES WITH THIS
     COURT'S LOCAL RULES AND IS PROCEDURALLY PROPER ...... 3

     A.   Interim Class Counsel Satisfied Local Rule 7-3's Meet and
          Confer Requirements ................................................................. 3

     B.   The Timing of Espejo's Filings, and His Notices that Those
          Conferences Took Place, Also Satisfy Local Rule 7-3 .................... 6

III. ESPEJO MAY PROPERLY INTERVENE BECAUSE HIS
     INTERESTS AND THOSE OF THE CLASS ARE NOT
     ADEQUATELY REPRESENTED BY HIBLER'S COUNSEL ............. 7

     A.   The Standard for Intervention in Class Action .............................. 7

     B.   The Inadequacy of Hibler's Counsel and the Questionable
          Events Surrounding the Proposed Settlement Weigh in Favor
          of Intervention ......................................................................... 9

          1.   Hibler and His Counsel Have Failed to Fulfill Their
               Duties to the Class: The Proposed Settlement is Not
               "Record Breaking," but Instead, Fails to Account or
               Adequately Compensate Class Members for the Actual
               Value of Their Claims ....................................................... 10

          2.   The Circumstances Surrounding the Settlement Raise
               Questions about the Adequacy of the *Hibler* Class's
               Representation ................................................................. 13

     C.   Espejo's Intervention Would Further the Interest of Absent
          Class Members and Judicial Economy ......................................... 16

          1.   Intervention is Proper to Ensure Interim Lead Class
               Counsel Can Protect the Interests of the Class ................... 16

          2.   Intervention is Proper to Protect the Class Members'
               Interest in Transferring the Case to the Northern District
               of Illinois ...................................................................... 17

IV.  CONCLUSION ................................................................... 17

# TABLE OF AUTHORITIES

**United States Circuit Court of Appeals Cases:**

*Day v. Persels & Assocs., LLC*, No. 12-11887,
   2013 WL 4792547 (11th Cir. Sept. 10, 2013).................................. 8

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) ....................... 14

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995).................................................. 15

*Reynolds v. Beneficial Nat. Bank*, 288 F.3d 227 (7th Cir. 2002)........................... 14

*Twelve John Does v. District of Columbia*, 117 F.3d 571 (D.C. Cir. 1997)............. 8

*Vassale v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013)........................... 14

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)................................ 10

*Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266 (7th Cir. 1998) ...... 8

**United States District Court Cases:**

*Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal. 2007)........................... 14

*Adams, et al. v. AllianceOne Receivables Mgmt., Inc.*,
   No. 08-cv-0248, (S.D. Cal.) ................................................. 11

*Blair v. Shaver Imports, Inc.*, No. 06-cv-398,
   2008 WL 1924888 (N.D. Ill. Apr. 29, 2008)................................. 8

*Connor v. JP Morgan Chase Bank*, No. 10-cv-01284 (S.D. Cal. June 20, 2012) .. 10

*Davis v. J.P. Morgan Chase & Co.*, 775 F. Supp. 2d 601 (W.D.N.Y. 2011).......... 9

*De Walshe v. Togo's Eateries, Inc.*, 567 F. Supp. 2d 1198 (C.D. Cal. 2008) ......... 6

*In re Air Cargo Shipping Servs., Antitrust Litig.*,
   240 F.R.D. 56 (E.D.N.Y. 2006)............................................. 17

*In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582 (N.D. Ill. 1998)........................ 7

*In re Vitamins Antitrust Litig.*, No. 09-cv-197,
   1999 WL 1335318 (D. D.C. Nov. 23, 1999)................................. 8

*Lane v. Facebook, Inc.*, No. 08-cv-3845,
   2009 WL 3458198, (N.D. Cal. Oct. 23, 2009) .............................. 9

*Malta v. WellsFargo Home Mortgage*,
   No. 10-cv-1290, (S.D. Cal. May 3, 2013) ................................... 10

*Nelson v. Santander Consumer USA, Inc.*, No. 11-cv-307-bbc
   (W.D. Wis. Mar. 8, 2013)................................................... 12

*Newman v. Americredit Fin. Servs., Inc.*,
   No. 3:11-cv-03042 (S.D. Cal. Apr. 15, 2013) .............................. 13

*Nicholas v. Conseco Life Ins. Co.*, No. 12-cv-0845,
   2012 WL 1831509 (N.D. Ill. May 17, 2012) ............................... 7, 8, 15, 17

*O'Connor v. Boeing N. Am., Inc.*, No. 97-cv-1554,
   2003 WL 25691035 (C.D. Cal. Nov. 3, 2003) ............................... 7

*Partee v. United Recovery Grp.*, No. 09-cv-9180,
   2010 WL 1816705 (C.D. Cal. May 3, 2010) ............................... 7

*Reed v. Sandstone Props., L.P.*, No. 12-cv-05021,
   2013 WL 1344912 (C.D. Cal. Apr. 2, 2013) ............................... 6

*U.S. Steel Corp. v. Multistate Tax Com'n*,
   18 Fed. R. Serv. 2d 287 (S.D.N.Y. 1974) ............................... 8

*Wilson-Condon v. Allstate Indem. Co.*, No. 11-cv-05538-GAF,
   2011 WL 3439272 (C.D. Cal. Aug. 4, 2011) ............................... 6

**Judicial Panel on Multidistrict Litigation Cases:**

*In re Motor Fuel Temperature Sales Pracs. Litig.*, MDL No. 1840,
   2011 WL 5331678 (D. Kan. Nov. 4, 2011) ............................... 10

**Statutes and Court Rules:**

Fed. R. Civ. P. 24 ............................................................... 7, 8

L.R. 7-3 ............................................................... *passim*

**Secondary Sources:**

6a *Federal Procedure, Lawyer's Edition*, Class Actions ¶ 12:337 .......................... 8

Manual for Complex Litigation (4th ed.) §§ 21.61, 21.71, 22.11 (2004) ......... 14, 17

Rothstein, B.J., Willging, T.E., *Managing Class Action Litigation: A Pocket
   Guide for Judges*, 14 (2005) ............................................................... 14

# I.   INTRODUCTION

Over the course of nearly two years of litigation, involving significant formal and informal discovery and over a dozen in person and telephonic mediation sessions, Plaintiff-Intervenor Henry Espejo and Defendant Santander Consumer USA, Inc. reached a settlement in principle. That settlement (hereinafter, the "*Espejo* Settlement") was to give a guaranteed minimum of $40 million to the class and, critically, *$100 per call* to each class member submitting what the Parties regarded as a "long-form" claim form. Given that many class members received hundreds or even thousands of calls, the Espejo Settlement, negotiated by court-appointed interim class counsel, promised to give individual class members tens to hundreds of thousands of dollars. As Santander explained in open court, the only issue remaining was securing board approval for the deal.

Seeing (or perhaps even creating) a new opportunity in the form of a newly-filed case, Santander abandoned the negotiations in *Espejo* and, within a matter of weeks and without any discovery, negotiated the settlement in this case (the "*Hibler* Settlement"). Although Hibler and Santander claim that the *Hibler* Settlement is somehow worth hundreds of millions of dollars, the reality is, it is not. Rather, it is a claims-made settlement that Hibler's attorneys value at a few million dollars, and which Santander has represented to be worth materially no more than the $40 million segment of the Espejo Settlement. From the perspective of individual class members, it is a farce.

Rather than taking into account the actual value of their claims—which under the TCPA's strict liability regime would entitle them to a minimum of $500 *per call*—Hibler got them only $85 *per person*. The fact that Santander was on the verge of agreeing to the *Espejo* settlement, resulting in individual recoveries of over 1,000 times what Hibler achieved—was not because of some sleight of hand by Espejo or his attorneys. It is because of the realities of the situation facing Santander. Indeed, as explained below, Santander has already been hit with a

$571,000 individual judgment and has settled numerous of these individual cases for five and six figures. Without Hibler bailing Santander out, there was simply no end in sight.[1]

This becomes all the more troubling given that just recently in a similar TCPA case, this same set of attorneys (e.g., the Settling Parties' counsel) tried to push this type of deal through the Northern District of California. That attempt was rejected at preliminary approval for the very reason the *Hibler* Settlement must be rejected here: class members were being paid on a per person basis, even though many of them may have received countless unsolicited phone calls.

Rather than face the reality of what they are attempting to accomplish, Hibler and Santander try to attack Espejo's Petition primarily on procedural grounds: first, that the Petition violates the meet and confer requirements of the Local Rules; and second, that intervention is not available in "settled" class actions. As for any substantive defense of the *Hibler* Settlement, all the Settling Parties essentially say (repeatedly) is that the deal is a "record-breaking settlement." As explained in their Petition and further below, none of their arguments carry the day.

Regarding the requirement to meet and confer, Interim Class Counsel conferred with Santander's counsel about Espejo's intention to intervene and transfer at the very same hearing in which they learned of the *Hibler* Settlement. Thereafter and within two hours of learning of the Settlement, Interim Class Counsel also conferred by telephone with Hibler's counsel regarding intervention and transfer, and it was clear from those meet and confers that the Settling Parties would not alter their position regarding Espejo's requested relief. Thus, no further meet and confers were necessary or required.

As for the basis for intervention, Federal Rule 24 specifically contemplates absent class members intervening to protect their interests. As a result, courts

---

[1] Indeed, Hibler's own counsel admit that their settlement was "a result of [a] professional courtesy" between Settling Parties' counsel. (*See* Dkt. 12 at 22.)

regularly allow intervention where, as here, the proposed intervenor seeks to transfer an action to another district where identical cases involving the same claims, issues, and parties have been related, consolidated, and litigated for the better part of a year and a half. Indeed, without intervening, Espejo would have no opportunity to seek to transfer and return the litigation to its proper forum.

And, Hibler's counsel have proven themselves inadequate to represent the Class by colluding with Santander to release the Class's claims for an immaterial fraction of their actual value. In what seems to be a tacit admission of collusion, the Settling Parties cannot even get their stories straight about the details of the settlement process. While Hibler states that the Settling Parties first engaged in mediation before the Honorable Leo S. Papas on August 16th—one day after the negotiations between Espejo and Santander were terminated—and again on August 28th, Santander's story is that the Settling Parties engaged in only a single mediation on August 21st.

In the end, the *Hibler* Settlement is a sell out and intervention is necessary to protect the interests of the Class. Accordingly, Espejo's Petition should be granted.

## II.  ESPEJO'S MOTION TO INTERVENE COMPLIES WITH THIS COURT'S LOCAL RULES AND IS PROCEDURALLY PROPER.

The Settling Parties contend that the Petition fails to satisfy the meet and confer requirements of the Local Rules, first by failing to properly meet and confer, and second by filing less than seven days after meeting and conferring. As explained below, both arguments are without merit.

### A.  Interim Class Counsel Satisfied Local Rule 7-3's Meet and Confer Requirements.

The parties sufficiently conferred on the issues now before the Court. As explained in his Petition and Motion, Espejo first learned of the *Hibler* settlement on September 10th—immediately prior to a hearing with the *Espejo* Court to address, *inter alia*, the status of the parties' settlement negotiations in that case. (*See* Dkt. 8, Ex. 3 at ¶ 5.) Prior to, during, and after the status hearing in *Espejo*, Interim

1  Class Counsel, Santander's counsel, and Judge Kocoras discussed the terms of the
2  *Hibler* settlement, its inadequacy when compared to the relief already on the table
3  in the *Espejo* mediation, the concerns of collusion surrounding the *Hibler*
4  settlement, and the likelihood that Espejo would seek to intervene in this action and
5  to transfer the case to the Northern District of Illinois. (*See* Declaration of Jay
6  Edelson, attached as Exhibit A, at ¶ 6.)

7       Within two hours of the hearing, Interim Class Counsel spoke to Hibler's
8  counsel—Mr. Josh Swigart—by telephone. (Dkt. 8, Ex. 3 at ¶ 7.) During that
9  conversation, Interim Class Counsel explained their concerns that, *inter alia*, (i) the
10 *Hibler* settlement did not appropriately take into account the extent of Santander's
11 liability—both to individual Class members and to the Class as a whole—especially
12 in light of the individual judgments already obtained against Santander on these
13 issues; (ii) Hibler's counsel had not considered the pendency of the *Espejo* litigation
14 and the relief already negotiated there, nor even attempted to do so; and (iii) the
15 timing of the *Hibler* mediation and settlement (as Santander represented it to the
16 *Espejo* Court), the relationship between the Settling Parties' counsel, and the
17 complete lack of litigation in this case were all signs that the negotiations were
18 collusive and had not proceeded with the Class's best interests in mind. (*Id.* at ¶¶ 7
19 – 11.) Espejo's counsel also made clear that he would seek to intervene in this case
20 and to obtain all other appropriate relief (including transfer) in order to protect the
21 interests of the Class in the face of the inadequate *Hibler* Settlement. (*See* Edelson
22 Decl. ¶ 8.) Mr. Swigart responded that Hibler would proceed with the settlement
23 and oppose any relief Espejo might request. (*Id.*)

24      The next day, Interim Class Counsel again addressed their concerns to
25 Hibler's counsel, this time by way of a letter in which they confirmed the substance
26 of their September 10th conversation with Mr. Swigart, reaffirmed their concerns
27 with the *Hibler* settlement, and again made Espejo's intention to intervene and seek
   all appropriate relief. (*Id.* ¶ 9.) Mr. Swigart responded in his own four-page letter

explaining (i) his support for the *Hibler* settlement, (ii) his knowledge (or lack thereof) of the *Espejo* litigation and negotiations, and other matters pending against Santander, and (iii) his view that he would "deal with" any motion filed by Espejo "*when it is filed*."[2] (*Id.* ¶ 10) (emphasis added). Mr. Swigart's co-counsel, Mr. Abbas Kazerounian, also confirmed that position by e-mail shortly after filing Hibler's objection to the Petition and Motion, (Dkt. 10),[3] stating that "clearly we are not going to stipulate to your motion to intervene" and "[s]ince we are at an impasse, as you say, let's just put it in front of the Court."[4] (*Id.* ¶ 11.)

With this backdrop, it's clear that all involved were aware of Espejo's intent to intervene and seek transfer, and that both Hibler and Santander understood the bases of those requests and had sufficient opportunity to explore them with Interim Class Counsel. Given that and the fact that neither Hibler nor Santander ever suggested they believed additional discussion was necessary—or, in Hibler's case, refused to participate in any additional discussion whatsoever—there should be no doubt that Espejo properly met and conferred prior to filing, and he should be permitted to proceed with the Petition and Motion without further delay.

---

[2]     Mr. Swigart did not, however, indicate that he believed that further discussion on the Petition or Motion was necessary to satisfy L.R. 7-3. (Edelson Decl. ¶ 10.)

[3]     Mr. Kazerounian's statements came in response to several emails from Espejo's counsel offering to discuss "any aspect of this case" including the motions to "intervene/transfer". (Edelson Decl. ¶ 11.) To be clear though, Espejo's counsel offered to confer again not because they believed the parties hadn't sufficiently conferred on the relevant issues already (they had), but to attempt to understand Hibler's newly-stated position that the meet and confer process was defective, and to try (once again) to reach agreement on the pending motions (if possible) or any part of the proposed settlement (e.g., the form of the notice to be disseminated to the Class). (*Id.*) Unfortunately, those efforts proved fruitless.

[4]     During the same e-mail exchange, both Mr. Swigart and Mr. Kazerounian claimed that they would only be willing to speak further about the case and Espejo's requests to intervene and transfer if he withdrew the Petition and Motion and re-filed them after the parties had (in their view) sufficiently met and conferred (whatever that might mean). (Edelson Decl. ¶ 11.) Espejo declined that request.

### B. The Timing of Espejo's Filings, and His Notices that Those Conferences Took Place, Also Satisfy Local Rule 7-3.

Following the proper meet and confer process, Espejo's Petition and Motion were timely. Espejo filed his Petition and Motion on September 16th—six days after counsel's conferences and after confirmation that no agreement could be reached with respect to the relief Espejo seeks. (*See* Dkts. 8, 9.) And though the filings came a day early, they were nonetheless appropriate given that Interim Class Counsel *did* confer with counsel for the Settling Parties and understood from their statements that under no circumstances would either consent to intervention or transfer, and neither claim to have been prejudiced by Espejo's prompt filings. *See Reed v. Sandstone Props., L.P.*, No. 12-cv-05021, 2013 WL 1344912, at *6 (C.D. Cal. Apr. 2, 2013) ("Because Reed suffered no real prejudice as a result of the late conference, however, the court elects to consider the motion on the merits"); *Wilson-Condon v. Allstate Indem. Co.*, No. 11-cv-05538-GAF, 2011 WL 3439272, at *1 (C.D. Cal. Aug. 4, 2011) (though the plaintiff may not have fully complied with L.R. 7-3, the defendant did "not appear to have suffered any prejudice from Plaintiff's failure to meet and confer sufficiently in advance"); *De Walshe v. Togo's Eateries, Inc.*, 567 F. Supp. 2d 1198, 1201 (C.D. Cal. 2008) ("the Court finds that any potential violation of Local Rule 7-3 did not prejudice Plaintiff and the Court exercises its discretion to evaluate Defendant's motion on the merits.").

Likewise, the meet and confer notices accompanying Espejo's filings are proper. Both the Petition and the Motion state that "[p]rior to filing the instant motion, counsel for Plaintiff-Intervenor Espejo conferred with counsel for Hibler and counsel for Defendant Santander regarding their intent to do so and the bases for so doing." (Dkts. 8, 9.) Contrary to the Settling Parties' arguments, Espejo was not required to repeat verbatim the language of Local Rule 7-3, but rather provide a "statement to the following effect," which he did. *See* L.R.7-3. But even if that wasn't enough (and it is), Espejo's Petition and Motion also explain (in detail) the who, what, when, where, why, and how of each communication Interim Class

Counsel had with the Settling Parties' counsel regarding the filings. Thus, Espejo has provided a clear record of the meet and confer process preceding his filings, thereby satisfying Local Rule 7-3.[5]

## III. ESPEJO MAY PROPERLY INTERVENE BECAUSE HIS INTERESTS AND THOSE OF THE CLASS ARE NOT ADEQUATELY REPRESENTED BY HIBLER'S COUNSEL.

### A. The Standard for Intervention in Class Actions.

The Settling Parties next argue that if Espejo wants to challenge the settlement, he must do so by objecting, rather than intervening. That argument misses its mark. In reality, it is well settled that intervention under Rule 24 is equally available to absent class members. In fact, the Advisory Committee notes specifically contemplate that "a member of a class should have the right to intervene in a class action if he can show the inadequacy of the representation of his interest by the representative parties before the court." *See* Fed. R. Civ. P. 24, Advisory Cmte. Notes (1966). The courts have agreed, consistently finding that "[i]n the class action context, absent (or unnamed) class members generally can intervene if the class representatives are no longer adequately representing their interests – although the absent class member must technically meet either Rule 24(a)'s or (b)'s requirements as well." *In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 589 (N.D. Ill. 1998). As a result, district courts throughout the country regularly allow absent class members to protect their interests by intervening. *See, e.g., Nicholas v. Conseco Life Ins. Co.*, No. 12-cv-0845, 2012 WL 1831509, at *3 (N.D. Ill. May 17, 2012) (allowing a named plaintiff in an identical class action to intervene, because opting out of a proposed settlement would prevent her from

---

[5]      Even if the circumstances described above didn't satisfy the requirements of L.R. 7-3 (they do), the Court may (and should) still—in its discretion—allow the Petition and Motion to proceed. *See, e.g., Partee v. United Recovery Grp.*, No. 09-cv-9180, 2010 WL 1816705, at *1 n.1 (C.D. Cal. May 3, 2010) (considering a party's motion though the notice of motion did not include the statement provided in L.R. 7-3); *O'Connor v. Boeing N. Am., Inc.*, No. 97-cv-1554, 2003 WL 25691035, at *9 (C.D. Cal. Nov. 3, 2003) (refusing to strike a motion based on the moving party's failure to comply with L.R 7-3).

1  pursuing her action on behalf of a nationwide class, and therefore, her interests

2  weren't protected); *Day v. Persels & Assocs., LLC*, No. 12-11887, 2013 WL

3  4792547, at \*11 (11th Cir. Sept. 10, 2013); *Williams v. Gen. Elec. Capital Auto*

4  *Lease, Inc.*, 159 F.3d 266, 269 (7th Cir. 1998).

5      As in any case, when considering a petition to intervene, a court must "strike

6  a 'balance between keeping class litigation manageable and allowing affected

7  parties to be adequately heard . . . .'" *See In re Vitamins Antitrust Litig.*, No. 09-cv-

8  197, 1999 WL 1335318, at \*2 (D.C. Cir. Nov. 23, 1999) (citing *Twelve John Does*

9  *v. District of Columbia*, 117 F.3d 571 (D.C. Cir. 1997)). "[T]his delicate balancing

10  of interests turns on a myriad of case-specific facts"—for example, the stage of the

11  proceedings, the amount of discovery that has been taken, and (in the class action

12  context) whether notice has been disseminated to the class. *Id.* (internal quotations

13  omitted).

14      Particularly relevant to this case, when dealing with a proposed class action

15  settlement, intervention at the earliest stage possible furthers the interests of judicial

16  economy where—as in this instance—the intervention issue can be decided prior to

17  discovery, prior to preliminary approval, and prior to class notice. *See, e.g., Blair v.*

18  *Shaver Imports, Inc.*, No. 06-cv-398, 2008 WL 1924888 (N.D. Ill. Apr. 29, 2008);

19  6a *Federal Procedure, Lawyer's Edition*, Class Actions ¶ 12:337 ("A motion to

20  intervene under Fed. R. Civ. P. 24(b) in a class action is also timely where made

21  before substantial discovery has taken place and before the court has examined the

22  merits of the case.") (citing *U.S. Steel Corp. v. Multistate Tax Com'n*, 18 Fed. R.

23  Serv. 2d 287 (S.D.N.Y. 1974)); Fed. R. Civ. P. 24, Advisory Cmte. Notes (A class

24  member "should not be put to the risk of having a judgment entered in the action

25  which by its terms extends to him, and be obliged to test the validity of the

26  judgment as applied to his interest by a later collateral attack."). The same analysis

27  holds true when (as here) a court must consider a class member-intervenor's motion

to transfer to another forum for consolidation with related proceedings. *See*

1  *Nicholas*, 2012 WL 1831509 (allowing intervention in three-month old putative

2  class action and granting motion to transfer to forum where parallel litigation had

3  been pending for several years).

4      None of Settling Parties' authorities compel a different result. Instead, the

5  district courts in those cases considered the propriety of intervention under Rule 24

6  (tacitly acknowledging that intervention was an available option in class actions),

7  but ultimately denied the petitions because the proposed intervenors had failed to

8  meet the Rule's requirements—for example, because they were unable to present

9  proof of the inadequacy of the named-plaintiffs and their counsel. *See Lane v.*

10  *Facebook, Inc.*, No. 08-cv-3845, 2009 WL 3458198, at *5 (N.D. Cal. Oct. 23,

11  2009) (denying motion to intervene that was filed two weeks *after* the plaintiffs

12  moved for preliminary approval and recognizing that the proposed intervenors,

13  though otherwise permitted to do so, "have failed to establish that their rights to

14  raise these issues are not adequately protected through the process for submitting

15  objections that will follow up on preliminary approval"); *Davis v. J.P. Morgan*

16  *Chase & Co.*, 775 F. Supp. 2d 601, 607 (W.D.N.Y. 2011) (finding that proposed

17  class member intervenors had not overcome the presumption of adequacy of

18  representation, but recognizing that it could be overcome).[6]

19      By contrast and as discussed in detail in his Petition and below, Espejo has

20  shown that each of Rule 24's requirements is met here, and that intervention is

21  unquestionably necessary and appropriate to protect both his and the Class's

22  interests.

23      **B.    The Inadequacy of Hibler's Counsel and the Questionable Events
           Surrounding the Proposed Settlement Weigh in Favor of
24         Intervention.**

25

---

26  [6]    Unlike the Settling Parties suggest, none of these cases stand for the
    proposition that intervention by a putative class member is *per se* improper. Nor do
27  they support the idea that Rule 23's objection mechanism is the only means by
    which class members may raise attacks on the adequacy of representation or the
    appropriateness of a proposed class action settlement.

1.   **Hibler and His Counsel Have Failed to Fulfill Their Duties to the Class: The Proposed Settlement is Not "Record Breaking," but Instead, Fails to Account or Adequately Compensate Class Members for the Actual Value of Their Claims.**

The Court need look no further than the terms of the *Hibler* Settlement itself to see that Hibler and his counsel are inadequate to represent the Class.[7] Indeed, despite lauding the Settlement as the largest in TCPA history—supposedly securing more than $345 million in relief for the Class—there is no question that neither Hibler nor Santander actually believe the settlement is worth that much.

The first indication is that although they claim to have secured hundreds of millions for the Class, Hibler's counsel nevertheless agreed to seek no more than $1.6 million in attorneys' fees and costs—i.e., just 0.004% of the settlement's supposed value. (*See* Dkt. 8, Ex. 1.) While that's no pittance to be sure, it falls exponentially short of the Ninth Circuit's 25% benchmark in consumer class actions—which would equal more than $86 million if Hibler's settlement valuation were accurate—as well as Hibler's counsel's standard practice of negotiating fee awards between 20% and 30% in TCPA settlements. *See, e.g., Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1048-1050 (9th Cir. 2002) (recognizing the 25% benchmark for attorneys' fees in consumer class actions in the Ninth Circuit). For example, in several cases where Hibler's counsel obtained just 5% or less of the class relief purportedly in question here, they sought and obtained fee awards many multiples greater than in the *Hibler* Settlement. *See, e.g., Malta v. WellsFargo Home Mortgage*, No. 10-cv-1290, Dkt. 56-1 (S.D. Cal. May 3, 2013) (seeking more than $3.8 million in attorneys' fees and costs from $17.1 million TCPA class settlement fund); *Connor v. JP Morgan Chase Bank, et al.*, No. 10-cv-01284, Dkt. 60 (S.D. Cal. June 20, 2012) (seeking more than $2.25 million in attorneys' fees

---

[7]    When determining whether proposed class counsel is adequate, courts may consider "(1) whether collusion exists between the representative and the opposing party; (2) whether the representative fails in fulfilling his duty; and (3) whether the representative has an interest adverse to the proposed intervenors." *See In re Motor Fuel Temperature Sales Pracs. Litig.*, MDL No. 1840, 2011 WL 5331678, at *3 (D. Kan. Nov. 4, 2011).

1   and costs from $9 million TCPA class settlement fund); *Adams, et al. v.*

2   *AllianceOne Receivables Mgmt., Inc.*, No. 08-cv-0248, Dkt. 109-1 (S.D. Cal.)

3   (seeking more than $2.7 million in attorneys' fees and costs from $9 million TCPA

4   class settlement fund). In short, it's simply impossible to reconcile Hibler's

5   counsel's past practice with their stated valuation of the settlement here, unless of

6   course the reality—as it must be—is that they don't believe it's worth hundreds of

7   millions of dollars. In reality and taking into account the Ninth Circuit's benchmark

8   and counsel's own past practices, it's more likely that the true value of the deal is

9   closer to about $6.4 million.

10       Santander also admits to placing a far lesser value on the settlement. That is,

11   when the parties appeared before the *Espejo* court on September 10th, Santander

12   represented that—other than the "long claim form" negotiated there, which was the

13   crucial part of the *Espejo* settlement as it would have allowed Class members who

14   received repeated unauthorized calls from Santander to obtain tens or hundreds of

15   thousands of dollars for their individual claims—the *Espejo* settlement and the

16   *Hibler* Settlement offered *essentially the same relief.* (Edelson Decl. ¶ 7.) That's

17   significant because in *Espejo*, the parties agreed that—again, aside from the "long

18   form" claim form—Santander would make a guaranteed payment (i.e., no reverter)

19   of $40 million. (*Id.* ¶ 4.) Thus, at most Santander actually views the *Hibler*

20   settlement as having a $40 million price tag and in reality, it must value it at a lower

21   amount, given that the *Hibler* settlement (unlike Espejo's) doesn't guarantee any

22   payout to the Class whatsoever (except, of course, for attorneys' fees and an

23   incentive award).

24       Critically, the Settling Parties don't even attempt to explain why the paltry

25   $85 recovery per Class member is adequate. That's because they can't. Indeed, by

26   settling out the claims of class members who received dozens, hundreds, and even

27   thousands of calls, for a maximum of $85 per person, the *Hibler* Settlement treats

the class's claims on a per-person basis. But the fact of the matter is, the claims of

1    many class members under the TCPA are worth tens if not hundreds of thousands

2    of dollars. Indeed, Espejo himself received over two hundred unauthorized calls

3    from Santander making his potential recovery a statutorily mandated amount of

4    $100,000—without having to prove willfulness necessary for trebling to $300,000.

5    These numbers are by no means theoretical. Rather, Santander's unlawful

6    conduct has led to at least one instance of an individual plaintiff, who received 1026

7    calls, obtaining a $571,000 judgment against Santander on these issues. *See Nelson*

8    *v. Santander Consumer USA, Inc.*, No. 11-cv-307-bbc, Dkt. 141 (W.D. Wis. Mar. 8,

9    2013).[8] And, Santander knows that it pays out five and six figure settlements

10   routinely to individuals on these claims.

11   Indeed, this was the grim reality facing Santander when it recommended for

12   its board to approve entering into the Espejo settlement structure and paying class

13   members $100 *per call* (and thus tens or hundreds of thousands of dollars

14   individually). In contrast, the *Hibler* Settlement, without any explanation or

15   analysis, would have the Court ignore the statute and ignore all of the litigation and

16   settlement activity involving Santander on these issues, and instead release these

17   massive claims for a mere $85.[9] Thus, it's not all that surprising that the Settling

18   Parties provide no justification[10] for why the $85 payment under the *Hibler*

19   _____

20   [8]    Santander challenges the precedential effect of the *Nelson* decision, but
     Santander's argument is misleading and off-point, and does not negate the fact that

21   TCPA claims against Santander, like those held by the Class members, have
     resulted in six-figure judgments. It's true that the judgment was vacated, but it was

22   by agreement of the parties pursuant to a settlement between them, not because the
     judgment was somehow entered in err. *See Nelson*, Dkts. 248, 249.

     [9]    It is worth noting that, by and large, the class members find themselves

23   indebted to Santander, and these TCPA claims that they possess are likely the most
     valuable assets they have to their name. Indeed, the mere threat of a counterclaim

24   worth $150,000 makes it nearly impossible for Santander to bring suit to collect
     debts that are, for the most part, worth $10,000 or less.

25   [10]   Likewise, the Settling Parties make no effort to explain how or why

26   Santander is receiving a release of claims from some 4 million class members under
     the *Hibler* Settlement, as opposed to the 2 million individuals—a number confirmed

27   through actual discovery in *Espejo* and by Santander's counsel—covered by the
     substantially identical *Espejo* class definition. Espejo pointed this out in his opening
     brief, and the Settling Parties just completely ignored the point.

1  Settlement is sufficient to compensate the class's injuries because—in light of the

2  potential life-altering recoveries available to class members—there is no

3  justification.

4          This is not the first time that this same set of attorneys have tried to put a deal

5  like this together in a TCPA case of this sort. (*See* Petition at 3 n.4.) Far from

6  merely working together to settle cases in the past, the Settling Parties' counsel

7  have negotiated settlements that suffer from the same signs of collusion as this case,

8  including one recent TCPA class settlement that failed to even receive *preliminary*

9  approval. *See Newman v. Americredit Fin. Servs., Inc.*, No. 3:11-cv-03042-DMS-

10  BLM, Dkt. 35 (S.D. Cal. Apr. 15, 2013). In *Newman*, the Court denied approval,

11  *inter alia*, because the parties failed to offer any reasoning behind their valuation of

12  the case, and because all claimants would receive the same amount of money

13  regardless of the number of unlawful calls each received, *see id.* at *2 – 4, two

14  problems that Espejo has already identified with the *Hibler* Settlement. (*See*

15  Petition at 3; Motion at 2 n.1.) Indeed, as the Court in *Newman* pointed out:

16          [T]he proposed claim distribution raises fairness issues. The class
17          period spans more than five years, yet class members who received
           one unlawful call would be compensated the same as those who
18          received numerous calls over the years.

19  *See Newman*, Dkt. 35 at *3.[11] That the Settling Parties' counsel so casually repeated

20  the same mistakes again when negotiating the *Hibler* settlement only calls it in to

21  question further.

22                  2.      The Circumstances Surrounding the Settlement Raise Questions
                            about the Adequacy of the *Hibler* Class's Representation.

23          While the terms of the *Hibler* Settlement render it suspect in its own right,

24  the circumstances surrounding its negotiation cast serious doubt on Hibler's and his

25  counsel's ability to act in the class's best interests. As explained at length in the

26  ────────────────
   [11]     Not only does the proposed *Hibler* Settlement suffer from the same fatal
27  distribution flaw that afflicted the *Newman* settlement, both cases "settled without
   any substantive motion practice," and were mediated at the very beginning of the
   cases by Judge Papas (ret.). *See Newman* Dkt. 35 at *2.

Petition, the Settlement appears to be the product of a reverse auction, and the Settling Parties oppositions do nothing to dispel that view. *See* Rothstein, B.J., Willging, T.E., *Managing Class Action Litigation: A Pocket Guide for Judges*, 14 (2005) (citing Manual for Complex Litigation (4th ed.) §§ 21.61, 21.71 (2004)). To start, the stark difference between the $85 per Class member obtained under the *Hibler* Settlement and the tens if not hundreds of thousands of dollars in potential individual relief negotiated in *Espejo* strongly suggests the existence of collusion. *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 227, 284 (7th Cir. 2002) (finding collusion existed between settling parties when "[t]he lawyers for the settlement class were richly rewarded for negotiations that greatly diminished the cost of settlement to [defendant] from the level that it had considered to be in the ballpark years earlier when the cases were running more in its favor than when the settlement agreement was negotiated.").

Further still, that Hibler's attorneys will receive $1.6 million for just one month (really, a few days within a month) of work that included only the filing of a complaint strongly suggests collusion.[12] *See, e.g., In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013) (holding that district court abused its discretion in approving a settlement because "[t]he conclusion is unavoidable: the settlement gives 'preferential treatment' to class counsel 'while only perfunctory relief to unnamed class members.'") (citing *Vassale v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013)).

Additionally, that Santander negotiated the deal with Hibler while at the same time representing to Espejo and the *Espejo* Court that it was awaiting board approval of another settlement demonstrates the deceit that necessarily accompanies collusion. *See Acosta v. Trans Union, LLC,* 243 F.R.D. 377, 399 (C.D. Cal. 2007)

---

[12] Notably, both Hibler and Santander argue that Espejo's decision to intervene was lawyer-driven. It has no basis to make such an argument as Espejo's counsel has consistently put the Class members' interests in front of their own (for instance, negotiating class relief prior to any attorneys' fees).

("[A]ttorneys jockeying for position might attempt to cut a deal with defendants by underselling the plaintiffs' claims relative to other attorneys.") (quoting *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 788 (3d Cir. 1995)).

And it's certainly curious, to say the least, that Hibler and Santander cannot keep their stories straight as to when their mediation took place. For its part, Santander claims that a single mediation session took place in front of Judge Papas on August 21, 2013, (*see* Santander Opp. at 6:5 – 7), while Hibler claims that two mediations took place: one the day after Judge Andersen terminated the Espejo-Santander mediation—i.e., August 16th—and another twelve days later, on August 28th. (Hibler Opp. at 2: 17 – 23.) Regardless of what the real timing was, that Hibler went from filing to mediating in two-to-three weeks, and from filing to settled in just over a month, is questionable enough.[13] It's even more suspicious that now the Settling Parties disagree as to the course of events and conspicuously fail to explain, *inter alia*, (i) when they first spoke about a potential mediation, (ii) when they selected Judge Pappas as the mediator, and (iii) when they actually reserved a date (whatever it was) to mediate with him.[14] They also fail to explain how if (as they claim) no discussions took place before the *Espejo* mediation was adjourned,

---

[13]      Not only is it questionable, but courts have recognized such conduct as a reason to allow intervention. For instance in *Nicholas v. Conseco Life Ins. Co.*, "[i]n a span of two months" the plaintiff filed a class action lawsuit, "hired a former federal judge as a mediator, and negotiated a settlement with defendant whereby a nationwide class would be certified and all class members would be permanently barred and enjoined from filing, commencing, continuing, prosecuting, or receiving benefits or other relief from any other lawsuit based on or relating to the claims alleged" in the newly-filed lawsuit. 2012 WL 1831509, at *1. To protect the class's interests, the court not only allowed the petitioner to intervene but also transferred the action to the jurisdiction that had been overseeing the case for years and had more familiarity with the claims. *Id.* at *3 – 5. This Court should do the same, as the facts here are uncannily similar.

[14]      The questions don't end there. Is it truly reasonable to think that the Espejo-Santander mediation could have—in good faith—ended on August 15th and Hibler and Santander decided that day to go to mediation on the 16th? Were they really able to schedule mediation for the following day? Did they provide Judge Pappas with mediation briefs or inform him of the *Espejo* negotiations? What (if any) information did Hibler have about the Class's claims and Santander's liability before going into the mediation? And, so on.

1  all of that was accomplished in just 1 to 6 days between then and the mediation.[15]

2  For all of these reasons, Hibler and his counsel have without question failed to

3  adequately protect[16] Espejo and the other members of the Class, and Espejo's

4  Petition should therefore be granted.

5  **C.  Espejo's Intervention Would Further the Interests of Absent Class**
6  **Members and Judicial Economy.**

7       Finally, if Espejo is unable to intervene, the interests of the Class members

8  and judicial economy will undoubtedly be stymied, both because his counsel will be

9  unable to fulfill their responsibility for protecting the Class as Interim Class

10 Counsel and because the Class will lose the opportunity to litigate in the Northern

11 District of Illinois.

12      1.  Intervention is Proper to Ensure Interim Lead Class Counsel Can
13          Protect the Interests of the Class.

14      Espejo's counsel has a role greater than just prosecuting Espejo's individual

15 claim. Rather, as Interim Class Counsel in the consolidated matters pending in the

16 Northern District of Illinois, Espejo's counsel has the duty to protect every person

17 affected by Hibler's action and, consequently, his settlement.

18      Courts appoint interim class counsel to avoid the very problem now before

19 this Court: to ensure that one party is in charge of engaging in settlement

20 _____

[15]  Tellingly, neither Hibler nor Santander explain that Judge Andersen called
21 off the *Espejo* mediation because of the Settling Parties' collusive dealings. But, to
   the extent the Court has any question about the timing of the negotiations it need
22 not take Espejo's word for it; Espejo would respectfully urge instead that it simply
   speak to Judge Andersen directly.

23 [16]  The failure of Hibler's counsel to protect the interests of the class is ever
   more apparent considering that Hibler has now breached the *Hibler* Settlement.
24 That is, under the terms of the Settlement, Hibler was required to move for
   preliminary approval by September 24, 2013, but failed to do so. Thus, Hibler has
25 now provided Santander with grounds to terminate the Settlement. If the Settling
   Parties truly believed the *Hibler* Settlement offered the class exceptional relief, then
26 one would think they would do everything that the Settlement required so as to
   make available the relief to the class. (*See* Dkt. 8, Ex. 1 ¶ 2.01.) Tellingly, that has
27 not happened.

discussions and prosecuting the claims, so as to prevent separate counsel from competing against one another in a way that ultimately harms the interests of absent class members. *See, e.g. In re Air Cargo Shipping Servs., Antitrust Litig.*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006) (citing Manual for Complex Litigation (Fourth) § 22.11 (2004)) (noting that interim class counsel "is probably essential for efficient case management" and has responsibilities including "negotiating settlement"). As Interim Class Counsel, Espejo's counsel has done—and is continuing to do—just that. Now, if Espejo's Petition is denied, Interim Class Counsel will be unable to perform its duty and the Class will be left with inadequate representatives.

Accordingly, the Court should grant Espejo's Petition.

2.    Intervention is Proper to Protect the Class Members' Interest in Transferring the Case to the Northern District of Illinois.

Finally and as explained further in Espejo's Reply in support of his Motion to Transfer, the Class members have an interest in having the action litigated with those already consolidated in the Northern District of Illinois. Without Espejo's counsel, no one will be willing to protect this interest. This is especially true as Hibler's counsel is doing everything they can to prevent transfer, arguing that "Espejo can't seek to transfer because he hasn't properly intervened. But if he does intervene, he can't seek transfer." For this interest alone, the Court should grant Espejo's Petition. *See generally Nicholas*, 2012 WL 1831509 (granting a named plaintiff's motion to intervene and transferring the action after finding that the intervenor's interests would be inadequately represented by the parties—who, not surprisingly, were opposing the motion to transfer).

## IV.    CONCLUSION

For the reasons stated above, Plaintiff-Intervenor Henry Espejo, on behalf of himself and all others similarly situated, respectfully requests that this Court enter

an Order (i) granting his Petition to Intervene,[17] and (ii) providing such other and further relief it deems reasonable and just.

Respectfully submitted,

**HENRY ESPEJO**, individually and on behalf of all others similarly situated,

Dated:  October 7, 2013

By:   /s/ Sean P. Reis
       One of Espejo's Attorneys

JAY EDELSON*
jedelson@edelson.com
RAFEY S. BALABANIAN*
rbalabanian@edelson.com
BENJAMIN H. RICHMAN*
brichman@edelson.com
CHRISTOPHER L. DORE*
cdore@edelson.com
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone:  (312) 589-6370
Facsimile:  (312) 589-6378

SEAN P. REIS (SBN 184044)
sreis@edelson.com
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123

*Pro Hac Vice admission to be sought

---

[17]     If, however, the Court denies Espejo's Petition, he requests that he be permitted to conduct limited discovery for the purpose of investigating the circumstances and timing of the Settling Parties' negotiations. See Davis, 775 F. Supp. 2d at 607 (recognizing that intervenors may be entitled to discovery to overcome the presumption of adequacy).

REPLY IN SUPPORT OF                    18                    CASE NO. 5:13-cv-1354-JGB-OP
PETITION TO INTERVENE

## <u>CERTIFICATE OF SERVICE</u>

I, Sean P. Reis, an attorney, hereby certify that on October 7, 2013, I served the above and foregoing ***Plaintiff-Intervenor Henry Espejo's Reply In Support Of Petition to Intervene****,* by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF system, on this 7th day of October 2013.

/s/ Sean P. Reis